**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Ezzie Johnson, | : | Case No. 1:09 CV 01543 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C § 405(g), of Defendant's final determination denying his claim for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Pending are the parties' briefs on the merits (Docket Nos. 16 and 18). For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

### I. PROCEDURAL BACKGROUND

On February 20, 2007, Plaintiff filed an application for SSI alleging that his disability began on January 29, 2007 (Docket No. 12, p. 12). The application was denied initially and upon reconsideration (Docket No. 12, pp. 48-54, 56-58). Plaintiff requested a hearing before an Administrative Law Judge (ALJ). A video hearing was conducted by ALJ L. Zane Gill on October 8, 2008 (Docket No. 12, p. 24). Plaintiff and Ted Masey, a Vocational Expert (VE) appeared and testified. On December 2, 2008, the

ALJ issued an unfavorable decision denying Plaintijusff's SSI application (Docket No. 12, pp. 9-23). The Appeals Council affirmed the Commissioner's decision on May 20, 2009 (Docket No. 12, pp. 1-2).

## II. FACTUAL BACKGROUND

Plaintiff was 53 years of age at the time of the alleged onset of his disability. He was 55 years of age at the time of the hearing (Docket No. 12, p. 28). Plaintiff was right-hand dominant and he ambulated with a cane (Docket No. 12, p. 28).

For the three months prior to the hearing, Plaintiff worked approximately five hours every Sunday monitoring bathrooms (Tr. 28). During the past fifteen years, Plaintiff had been employed as a cook for three years (Docket No. 12, 29). As a cook, Plaintiff prepared all meals including breakfast, lunch or dinner (Docket No. 12, p. 32, 33). He estimated that the time needed to train to cook as he did would require, at a minimum, a couple of months (Docket No. 12, p. 34). Plaintiff was also employed as a general laborer with various temporary agencies. In that capacity, he lifted as much as fifty pounds and twenty pounds on a frequent basis (Docket No. 12, p. 29, 33-34).

In January, 2007, Plaintiff injured his left hand while using a saw. The saw amputated the index finger and partially amputated the middle finger of his left hand (Tr. 171-172). After hospital admission, Plaintiff had a revision amputation of his left index finger and flexon tendon repair of his left middle finger. The partial amputation healed well but the middle finger developed reflex sympathetic dystrophy. In that finger, Plaintiff had swelling, stiffness, pain, increased sensitivity to heat and cold and decreased range of motion (Docket No. 12, p. 29, 31). Plaintiff's counsel summarized Plaintiff's impairments as insomnia due to pain, sensitivity to cold temperatures, degenerative changes at L5-S1, knee problems

2

which include pain and swelling, back pain, bicrepitus of the knees, osteoarthritis and moderate narrowing of the lateral knee joints Docket No. 12, p. 30).

Plaintiff estimated that the heaviest that he could lift was fifty pounds (Docket No. 12, p. 33). He was taking over-the-counter medication such as Motrin or Tylenol to relieve pain (Docket No. 12, p. 36).

Considering a person of Plaintiff's age, education and work experience, with an ability to carry twenty-five pounds frequently, fifty pounds occasionally, sit six of eight hours, stand or walk for four hours out of eight, push and pull restricted to lifting and carrying limitations, the VE explained that the medium and light jobs would be eliminated from consideration for employment (Docket No. 12, p. 36-37).

Assuming the first hypothetical was altered to include a total of only four hours standing and walking, plus sitting six of eight hours and standing for the remaining hours, the profile of competitive full-time employment compatible with Plaintiff's impairments would include employment as a bench assembler, a light unskilled job, a wire worker, a light unskilled job, and a final assembler, a sedentary unskilled job (Docket No. 12, p. 39, 40).  The VE claimed that there were 600 bench assembler jobs in Northeast Ohio and nationally, approximately 105,000 (Docket No. 12, p. 39).  The number of wire worker jobs was 800 in Northeast Ohio and across the country, approximately 100,000.  The number of final assemblers jobs would be 600 jobs in Northeast Ohio and nationally, approximately 100,000 (Docket No. 12, p. 40).

The VE opined that the jobs he recommended, would require that the worker have at least one hand to do some gripping at times (Docket No. 12, p. 41).  Cold temperatures would not affect the numbers of jobs.

### III. MEDICAL EVIDENCE

On or about September 25, 2006, the General Ability Measure for Adults Intelligence Quotient was administered. Plaintiff's results fell within the average category of mental ability (Docket No. 12, p. 169).

On January 29, 2007, Plaintiff was admitted to the Ohio State University Health System for treatment of a work-related injury involving a power saw. Plaintiff's left index finger had been amputated at the level of the distal interphalangeal joint and the left middle finger had been partially amputated with a significant volar laceration which jeopardized blood flow to the middle finger (Docket No. 12, pp. 196, 198). The radiological views of his hand showed a comminuted fracture of the second middle phalanx and bony exostosis about the second metacarpal head (Docket No. 12, p. 170). Drs. Carl R. Coleman and Robert T. Gosline irrigated and debrided the necrotic skin margins on or about the middle finger, repaired the tendon and performed a revision amputation of the index finger at the level of the proximal interphalangeal joint (Docket No. 12, p. 199). Upon discharge from the hospital on February 6, 2007, Plaintiff received a prescription for pain medication (Docket No. 12, p. 180, 182).

On February 13, 2007, Plaintiff was prescribed a pain reliever for back and knee pain (Docket No. 12, p. 213). Plaintiff presented for treatment of left-hand pain on February 14, 2007. The radiological consultations conducted on February 14, 2007 and February 19, 2007, were compromised by the cast artifact overshadowing the image. There was, however, no fracture, dislocation, bony destructive lesion, or acute osseous injury identified (Docket No. 12, pp. 220, 409, 419, 422). Medications prescribed for pain were continued (Docket No. 12, pp. 405, 414).

Plaintiff was treated at the hand clinic on February 27, 2007 and participated for ten minutes in the therapeutic exercise for home program instruction and splint fabrication (Docket No. 12, p. 402).

On March 1, 2007, Plaintiff attended a 65-minute concurrent treatment (Docket No. 12, p. 400). He was diagnosed with minimal bursitis on March 6, 2007 (Docket No. 12, p. 218).

Plaintiff was treated at the Care Alliance on March 2, 2007 for a rash on his forearm (Docket No. 12, p. 433).  Plaintiff participated in a 50 minute treatment on March 5, 2007 consisting of flexion and extension exercises (Docket No. 12, p. 396).

Plaintiff presented to Dr. Jason D. Eubanks on March 5, 2007, for follow-up to his left index amputation and third flexor tendon laceration five weeks after the surgery.  Plaintiff's wounds looked well healed although his left third finger was swollen diffusely.  Plaintiff's request for a pain reliever was denied (Docket No. 12, p. 398).

Plaintiff was diagnosed with chronic right knee pain and minimal bursitis on March 6, 2007 (Docket No. 12, pp. 218, 394).  On March 9, 2007, Plaintiff presented to the emergency room with itchy skin and pain.  He was diagnosed with and treated for contact dermatitis and back pain (Docket No. 12, 233, 376-391).  On March 13, 2007, Plaintiff presented to the Care Alliance for treatment of right knee pain and swelling.  A pain reliever was prescribed (Docket No. 12, p. 431).  Plaintiff participated in a 50-minute concurrent therapy treatment on March 20, 2007, a 60-minute individual treatment on March 23, 2007 and March 30, 2007 (Docket No. 12, pp. 374, 376).  The goal in each therapy session was to decrease joint stiffness and pain in the limb.  In each instance, Plaintiff tolerated the treatment well.

On April 2, 2007, Dr. Esberdado Villanueva, M.D., opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, sit, stand and/or walk about six hours in an eight-hour workday and push and/or pull on an unlimited basis, other than as shown for lift and/or carry (Docket No. 12, p. 239).

On April 4, 2007, Dr. Aashish Patel, M. D., diagnosed Plaintiff with phantom pain in his right hand (Docket No. 12, p. 366). On April 6, 2007, Plaintiff participated in a 45-minute treatment with the occupational therapist (Docket No. 12, p. 361). Dr. Eubanks noted on April 9, 2007, that the tendon repair was healing well. There was a slight flexion deformity at the dip joint but it had improved (Docket No. 12, p. 358).

On April 10, 2007, Plaintiff participated in a 50-minute concurrent treatment (Docket No. 12, p. 359). On April 13, 2007, Plaintiff participated in another 45 minute concurrent treatment provided by the physical therapist (Docket No. 12, 356). On April 17, 2007 and April 24, 2007, Plaintiff participated in a 55 minute concurrent treatment by the occupational therapist (Docket No. 12, 350, 354).

On May 15, 2007, Plaintiff was treated at Care Alliance for a wound infection on his left middle finger (Docket No. 12, p. 436).

Plaintiff presented on May 15, 2007 for concurrent treatment by the occupational therapist. The therapist noted slow steady progress was being achieved (Docket No. 12, p. 343). On May 16, 2007, a radiological consultation was completed and compared to the study on February 14, 2007. The results showed soft tissue swelling of the third digit. There was no fracture, subluxation or radiopaque foreign body (Docket No. 12, p. 340).

On May 21, 2007, Dr. Omid Rashidi noted that the range of motion in Plaintiff's third finger was improving. There was decreased sensitivity in the left hand on the distal phalanx of the third finger with mild edema on the middle and distal phalanx (Docket No. 12, p. 326). Plaintiff participated in a 40 minute concurrent treatment. He was unable to tolerate the massage/desensitization because of the increased pain in the ulnar side of the middle finger. He was, however, able to tolerate stretching and gripping exercises (Docket No. 12, p. 324).

On May 29, 2007, Dr. Kutaiba Tabbaa continued his medication but recommended that Plaintiff consider surgery for possible neurolysis of his lateral branch of the third finger (Docket No. 12, p. 322) Plaintiff completed the stretching and strengthening program on this date (Docket No. 12, p. 318).

Plaintiff completed a 55-minute individual treatment program on June 1, 2007. He tolerated the massage without lotion and without complaints or jumping. The therapist opined that Plaintiff's strength and range of motion were increasing (Docket No. 12, p. 316). On June 8, 2007, Plaintiff participated in another individual treatment plan. Plaintiff tolerated the massage without lotion and without complaints or jumping, however, the therapist noted that Plaintiff had developed a new blister over the dip volar surface (Docket No. 12, p. 313).

Dr. Brendan Astley continued Plaintiff's medication on June 12, 2007 (Docket No. 12, p. 310). Plaintiff underwent concurrent treatment on June 19, 2007. The therapist noted that Plaintiff's hypersensitivity was improving and he tolerated a light massage to the middle finger (Docket No. 12, p. 309). Plaintiff participated in a 30-minute concurrent treatment on June 27, 2007. The therapist adjusted the strap and splint and increased the range of motion to the middle finer (Docket No. 12, p. 307).

On July 10, 2007, Plaintiff showed decreased range of motion to the interphalangeal joint of the middle finger. The scar on the ulnar side of his middle finger was painful to touch so he wore the extension most of the time (Docket No. 12, p. 303-304). On July 12, 2007, Dr. Kutaiba Tabbaa performed a left stellate ganglion block (Docket No. 12, p. 300). Plaintiff tolerated the stretching/strengthening program administered on July 17, 2010 (Docket No. 12, p. 297). Also on this date, Dr. Tabbaa noted that Plaintiff had the same pain (Docket No. 12, p. 295). On July 19, 2007, Plaintiff tolerated the stretching/strengthening program well (Docket No. 12, p. 294). On July 24, 2007

and July 27, 2007, Plaintiff increased strength but decreased dip extension of his middle finger (Docket No. 12, pp. 293, 424 -427).

On August 13, 2007, Dr. Alvin James diagnosed Plaintiff with hand sprain and late effects of open wound extremity. It was too early to consider digital sympathectomy (Docket No. 12,p. 478). On August 24, 2007, Plaintiff met with Kathryn Stroh to assess the prospects of occupational therapy (Docket No. 12, p. 474). On September 14, 2007, Plaintiff was treated for chronic pain to his hand (Docket No. 12, pp. 468-470).

On October 1, 2007, Plaintiff complained of joint stiffness in the left long finger. He was referred to pain management (Docket No. 12, p. 467). On October 12, 2007, Plaintiff was treated for sharp and continuous pain made worse by touching (Docket No. 12, p. 464). On October 18, 2007, Dr. Kutaiba Tabbaa performed a left stellate ganglion block (Docket No. 12, p. 461). A stellate ganglion block was employed as well as a medication to be taken at bedtime (Docket No. 12, p. 464). In December 2007, Plaintiff reported no relief from the block (Docket No. 12, p. 455).

In January 2008, Plaintiff was treated for severe pain over the ulnar aspect of the left middle digit which he kept in a protective covering (Docket No. 12, p. 453).

At Care Alliance, Plaintiff was treated for athlete's foot on February 12, 2008 (Docket No. 12, p. 498). On March 25, 2008, Plaintiff presented for refills on his medication prescribed to control diabetes (Docket No. 12, p. 499). On April 17, 2008, Plaintiff presented to the emergency room for treatment of severe knee pain (Docket No. 12, 450). Plaintiff was discharged with a trial of Ultram, a pain reliever (Docket No. 12, p. 446, 447). On April 23, 2008, Plaintiff was treated at the clinic for chronic knee pain which had become progressively worse during the past two months. A cane was prescribed as Plaintiff's weakened state made him prone to falling (Docket No. 12, pp. 441, 442).

Although Plaintiff obtained two weeks of relief after a cortisone injection, he presented to Dr. Glenn Wera on May 28, 2008 complaining of right knee pain (Docket No. 12, p. 439).  On July 28, 2008, Plaintiff was evaluated for disability by Dr. Robert J. Gillespie, who explained that the function and pain emanating from the middle finger amputation would be improved with surgery (Docket No. 12, p. 494).

IV.  **STANDARD OF REVIEW**

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383 (c)(3). *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 832-33 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*see Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive so long as they are supported by substantial evidence.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  The court's review is limited to determining whether there is substantial evidence in the record to support the findings.  *Id.* (*citing Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 851 (6th Cir.1986)).  Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir.1981) *cert. denied,* 103 S. Ct. 428 (1983) (*quoting Richardson v. Perales*, 91 S. Ct. 1420, 1426 (1971)).  Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The court's role is not to resolve conflicting evidence in the record or to examine the

credibility of the claimant's testimony. *Id.* at 614-615 (*citing Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987)).

## V. STANDARD FOR ESTABLISHING DISABILITY

To establish disability under the Act, a claimant must show that he or she is unable to engage in substantial activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." *Underwood v. Commissioner of Social Security*, 2010 WL 424970, *4 (N. D. Ohio 2010) (*citing* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3)(A)). The claimant's impairment must prevent him or her from doing his or her previous work, as well as any other work existing in significant numbers in the national economy. *Id.* (*citing* 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3) (B)). A five-step sequential evaluation is employed to determine whether a claimant is disabled. *Id.* If a claimant can be found disabled or not disabled at any step of the sequential evaluation, the review ends. *Id.* (*citing* 20 C.F.R. § 404.1520(a)).

At Step One, the ALJ considers the claimant's work activity. A claimant is not disabled if engaged in substantial gainful activity, *i.e.,* working for profit. *Id.*

At Step Two, the ALJ considers the medical severity of the claimant's impairments. A claimant is not disabled if he or she does not have a severe medically determinable physical or mental impairment that also meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that are severe and meets the duration requirement. *Id.*

At Step Three, the ALJ determines whether the claimant has an impairment that meets or equals one of the criteria of an impairment listed in Appendix 1 and meets the duration requirement. *Id.* (*see* 20 C.F.R. § Part 404, Subpart P, Appendix 1). A claimant is disabled if he or she has an impairment that

meets the listing and the duration requirement. *Id.* Before considering the fourth step, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), *i.e.,* the claimant's ability to perform physical and mental work on a sustained basis despite limitations from impairments. *Id.*

At Step Four, the ALJ considers whether the claimant's RFC permits him/her to perform past relevant work. *Id.*

At the final step, Step Five, the ALJ considers the claimant's RFC and his or her age, education, and work experience to determine whether the claimant may work. *Id.* Even if the claimant's impairment does prevent him/her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, then the claimant is not disabled. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *see also Barnhart v. Thomas*, 124 S. Ct. 376, 379 (2003) (describing five-step evaluation)).

The claimant bears the burden of proof at steps one through four. *Id*. (citing *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)). At Step Five, the burden shifts to the Commissioner to identify "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id*. (*citing Jones v. Commissioner of Social Security,* 336 F.3d 469, 474 (6th Cir. 2003)). The claimant bears the ultimate burden of proof on the issue of disability. *Id.* at *4-5 (*see* 20 C. F. R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled"); *Richardson v. Heckler*, 750 F. 2d 506, 509 (6th Cir. 1984) ("A social security disability claimant bears the burden of proof on the issue of disability."). The burden of proof regarding the establishment of disability onset date lies with the claimant. *Id.* (*citing McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 836 (6th Cir. 2006)). Moreover, the claimant has the burden of providing detailed medical evidence allowing the ALJ to make an informed

decision. *Id.* (*see Landsaw v. Secretary of Health & Human Services*, 803 F.2d 211, 214 (6th Cir. 1986)). Lastly, the claimant must not only produce a diagnosis of an impairment, but also demonstrate correlative functional limitations. *Id.* (*citing* 20 C.F.R. § 404.1512(c)).

### VI. ALJ DETERMINATIONS

The ALJ made the following findings:

1. Plaintiff did not meet the insured status requirements of the Act.

2. Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on February 20, 2007.

3. The medical evidence established that Plaintiff had severe status post amputation of two fingers on the left hand, right knee pain and lumbosacral pain. None of these impairments is severe.

4. These medically determinable impairments, individually or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. After careful consideration of the entire medical record, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work. Specifically, Plaintiff could lift, carry, push and pull up to fifty pounds occasionally, walk four hours in an eight-hour workday, and sit for six hours in an eight-hour workday. However, Plaintiff was unable to perform work that required more than occasional left hand handling, fingering and feeling. Additionally, Plaintiff was unable to perform work that required more than occasional stooping or bending or work that required any climbing of ladders, ropes and scaffolds.

6. Plaintiff, an individual approaching advanced age, had at least a high school education and could communicate in English.

7. Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework, Plaintiff is not disabled.

8. Considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

9. Plaintiff is not under a disability as defined in the Act.

(Docket No. 12, pp. 11-23).

## VII. DISCUSSION

Plaintiff contests the ALJ's determination of residual functional capacity. Specifically, the ALJ failed to consider that Plaintiff's left hand injury precluded the capacity to lift twenty-five pounds frequently or fifty pounds occasionally and that Plaintiff is unable to stand and walk at a medium level of exertion on a consistent basis. Plaintiff's second argument relates to credibility. He claims that the ALJ misinterpreted his requests of medical professionals for documentation that he was unable to work and the ALJ penalized him for his refusal to undergo further amputation.

### 1.   RESIDUAL FUNCTIONAL CAPACITY

A claimant's residual functional capacity is an assessment of physical and mental work abilities-what the individual can or cannot do despite his or her limitations. *Converse v. Astrue,* 2009 WL 2382991, *8 (S. D. Ohio 2009) (*citing* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002)). "Ordinarily, residual functional capacity is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . *Id.* A 'regular and continuing basis' means eight hours a day, for five days a week, or an equivalent work schedule." *Id.* (*citing* SOCIAL SECURITY RULING (SSR) 96-8p (emphasis in original) (footnote omitted) (*See* http://www.ssa.gov/OPHome/rulings/rulings.html)). The regulations charge the ALJ and the Commissioner with the responsibility for assessing a claimant's residual functional capacity. *Id.* (*see* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)). The Regulations distinguish between the assessment of a claimant's residual functional capacity versus a medical source opinion about a claimant's work abilities. *Id.* In fact, the Commissioner explains, through his Rulings, that residual functional capacity "is an administrative assessment of the extent to which an individual's

medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* (*citing* SSR 96-8p).

In contrast, the Commissioner more generally considers medical source statements as "medical opinions submitted by acceptable medical sources, including treating sources and consulting examiners, about what an individual can still do despite a severe impairment(s). . . ." *Id.* (*citing* SSR 96-5p).  The Commissioner further explains that from time-to-time, medical sources may provide opinions that an individual is limited to 'sedentary work,' 'sedentary activity,' 'light work,' or similar statements that appear to use the terms set out in our regulations and rulings to describe exertional levels of maximum sustained work capability.  *Id.*  Adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms.  *Id.*  The judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability. *Id.* (*citing* SSR 96-5p).

Here, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as described by Dr. Villanueva, a medical consultant who evaluated the record.  Based on Dr. Villanueva's evaluation, the ALJ concluded that the plaintiff retained the ability to lift or carry up to fifty occasionally and twenty-five pounds frequently and to stand, walk or sit for six hours a day, as required for medium work.  The ALJ also cited other physicians who claimed that Plaintiff could work with a splint (on his finger), despite some manipulative limitations in Plaintiff's left hand (Docket No. 12, pp. 18, 19).  The ALJ even considered whether Plaintiff could meet the mental demands of work.  The ALJ complied with the procedure for assessing residual functional capacity as defined in 20 C. F. R. § 404.1545, completing

14

a function by function assessment into the decision. The ALJ did not dismiss, without reason, any explanation provided by a treating source of Plaintiff's physical capacities (Docket No. 12, pp. 15-21). Since there is substantial evidence to support the ALJ's assessment of residual functional capacity, the Magistrate adopts the Commissioner's finding of Plaintiff's residual functional capacity.

**2.     PLAINTIFF'S CREDIBILITY.**

Where the objective medical evidence does not substantiate the claimant's subjective complaints, the ALJ must evaluate the credibility of the claimant in making those complaints. *Wines v. Commissioner of Social Security,* 268 F. Supp.2d 954, 957 (N. D. Ohio 2003) (*citing Walters v. Commissioner of Social Security*, 127 F. 3d 525, 531 (6th Cir. 1997). The ALJ's findings as to credibility are entitled to deference because he has the opportunity to observe the claimant and assess his/her subjective complaints. *Id.* at 957-958 (*citing Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001)). The regulations set forth factors that the ALJ should consider in assessing credibility. *Id.* These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. *Id.* (*citing* 20 C. F. R. § 416.929(c)(3)(i)-(vi)). If the ALJ rejects the claimant's complaints as incredible, he or she must clearly state his or her reasons for doing so. *Id.* (*citing Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

Again, the ALJ had no difficulty providing a narrative description of the aggravating factors (Docket No. 16, pp. 16, 17); the type, dosage, effectiveness, and side effects of medication (Docket No. 12, p. 6); and treatment or measures, other than medication, taken to relieve pain (Docket No. 12, pp. 16-18). It was within the ALJ's discretion to consider what Plaintiff had done to obtain the evidence necessary to show disability. Likewise, it was appropriate for the ALJ to consider the failure of Plaintiff

to undergo further amputation as a measure taken to relieve pain.  Since the credibility finding is based on substantial evidence, the Magistrate adopts the ALJ's credibility finding.

## VIII. CONCLUSION

For these reasons, the Magistrate affirms the decision of the Commissioner.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 29, 2010